# Unpublished Cases Cited in Defendant Kroll's Memorandum in Support of Its Motion to Dismiss and Defendant Kroll's Reply Memorandum in Support of Its Motion to Dismiss

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 4232729 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 4232729)**

**C**Montgomery v. City of Harvey
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Geoffrey MONTGOMERY, Plaintiff,
v.
CITY OF HARVEY, Deputy Marshal Sean Waller,
Star No. 843, Deputy Marshal Nichole Lewis, Star
No. 860, and Police Officer Eyad Askar, Star No.
834, Defendants.
**Civil Action No. 07 CV 4117.**

Nov. 28, 2007.

James A. Payonk, Jr., James A. Payonk, Jr. P.C.,
Chicago, IL, for Plaintiff.
Daniel Charles Murray, Eydie Rachel Glassman,
Mary K. Cryar, Johnson & Bell, Ltd., Chicago, IL,
for Defendants.

### MEMORANDUM AND ORDER

GEORGE W. LINDBERG, Senior District Judge.
**\*1** On July 23, 2007, Plaintiff Geoffrey Montgomery
filed an eleven-count complaint against Defendants
City of Harvey, Sean Waller, Nichole Lewis, and
Eyad Askar (collectively, "Defendants"). Defendants
City of Harvey, Lewis, and Askar ("Movants") filed
a motion to dismiss Counts IV, VIII, IX, X, and XI
pursuant to Federal Rule of Civil Procedure 12(b)(6)
on October 2, 2007. Defendant City of Harvey filed a
separate motion to dismiss Count VII pursuant to
Rule 12(b)(6) that same day. Movants' motion is
granted in part and denied in part. Defendant City of
Harvey's motion is granted.

### Analysis

Rule 12(b)(6) permits motions to dismiss a complaint
for "failure to state a claim upon which relief can be
granted...."FED. R. CIV. P. 12(b)(6). To survive a
Rule 12(b)(6) motion, "the complaint need only
contain a 'short and plain statement of the claim
showing that the pleader is entitled to relief.'"*Equal
Employment Opportunity Comm'n v. Concentra
Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir.2007)

(citation omitted). This requirement

impose[s] two easy-to-clear hurdles. First, the
complaint must describe the claim in sufficient detail
to give the defendant 'fair notice of what the ... claim
is and the grounds upon which it rests.'...Second, its
allegations must plausibly suggest that the plaintiff
has a right to relief, raising that possibility above a
'speculative level;' if they do not, the plaintiff pleads
itself out of court.[FN1]

> **FN1.** Neither party identified the correct
> legal standard applicable to Rule 12(b)(6)
> motions. *See Killingsworth v. HSBC Bank
> Nev., N.A.*, No. 06-1616, 2007 WL 3307084,
> at \*2 (7th Cir. Nov.9. 2007) ("In *Bell
> Atlantic*, the Supreme Court retooled federal
> pleading standards, retiring the oft-quoted
> *Conley* formulation that 'a complaint should
> not be dismissed for failure to state a claim
> unless it appears beyond doubt that the
> plaintiff can prove no set of facts in support
> of his claim which would entitle him to
> relief.'") (citations omitted).

*Id.* (citations omitted); *see also Killingsworth v.
HSBC Bank Nev., N.A.*, No. 06-1616, 2007 WL
3307084, at \*3 (7th Cir. Nov.9, 2007) ("The
[Supreme Court] explained in *Bell Atlantic* that the
'plaintiff's obligation to provide the 'grounds' of his
'entitlement to relief' requires more than labels and
conclusions, and a formulaic recitation of the
elements of a cause of action will not do.'...Although
this does 'not require heightened fact pleading of
specifics,' it does require the complaint to contain
'enough facts to state a claim to relief that is
plausible on its face.'") (citations omitted). When
determining whether Plaintiff has cleared these
hurdles, the Court "accept[s] the complaint's well-
pleaded allegations as true and draw[s] all favorable
inferences for [Plaintiff]."*Killingsworth*, No. 06-
1616, 2007 WL 3307084, at \*2 (citation omitted).

### I. Movants' Motion to Dismiss Counts IV, VIII, IX, X, and XI

### A. Count IV

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 2
Slip Copy, 2007 WL 4232729 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 4232729)**

Count IV alleges a claim for wrongful prosecution under 42 U.S.C. § 1983 against Defendants. Movants argue that Count IV must be dismissed because Plaintiff also alleges a state-law malicious prosecution claim in Count IX against Defendants.[FN2]The Court agrees.

> FN2. All of Plaintiff's state-law claims are based on Illinois law. Movants do not dispute that Illinois law governs each of those claims. The Court will therefore apply Illinois law when ruling on Movants' motion to dismiss. Cf. *Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, Inc.,* 136 F.3d 1116, 1120 (7th Cir.1998) ("It is true ... that '[t]he operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits....Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.'") (citation and emphasis omitted); *Grundstad v. Ritt,* 166 F.3d 867, 870 (7th Cir.1999) (same).

The facts alleged to state a claim for wrongful prosecution under Count IV are virtually identical to the facts alleged to state a claim for malicious prosecution under Count IX. (*Compare* Pl's. Compl., at ¶ 75, *with* Pl's. Compl., at ¶¶ 98-99.) As explained below, Plaintiff's state-law claim for malicious prosecution is not time-barred. (*See infra* p. 5.) Regardless, Count IV must be dismissed insofar as it states a claim for malicious or wrongful prosecution under 42 U.S.C. § 1983. In *Newsome v. McCabe,* the Seventh Circuit explained that "the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution."256 F.3d 747, 750-51 (7th Cir.2001) (The court also recognized that Supreme Court precedent "scotches any constitutional tort of malicious prosecution when state courts are open.") (citations omitted). This statement of law was affirmed in *Penn v. Harris*[FN3] and, subsequently, in *McCullah v. Gadert*[FN4]. The Court therefore dismisses Count IV without prejudice as to Movants.

> FN3.296 F.3d 573, 576 (7th Cir.2002) ("[A]s *Newsome* explained, there is no 'constitutional right not to be prosecuted

without probable cause.' A plaintiff therefore may not state a § 1983 claim simply by alleging that he was maliciously prosecuted. Instead, he must allege the violation of one of his constitutional rights, such as the right to a fair trial....Although *Newsome* precludes a malicious prosecution claim brought under § 1983, a state-law claim of malicious prosecution is still viable.") (citation omitted).

> FN4.344 F.3d 655, 658-59 (7th Cir.2003) ("In short, we found [in *Newsome* ] that the existence of a state-law tort remedy 'knocks out' any constitutional tort under due process for the same conduct.... [Nevertheless,] it is possible to state a § 1983 claim that relies on the Fourth Amendment.") (emphasis and citations omitted).

**B. Counts VIII, IX, X, and XI**

*2 Movants argue that the claims pled in Counts VIII, IX, X, and XI are time barred by the applicable statute of limitations. Count VIII alleges a state-law battery claim against Defendants Waller and City of Harvey. Count IX alleges state-law false arrest, false imprisonment, and malicious prosecution claims against Defendants. Count X alleges a state-law libel claim against Defendants. Count XI alleges a state-law claim for attorneys' fees against Defendants. These four counts are joined with multiple counts brought under 42 U.S.C. § 1983.

745 Ill. Comp. Stat. 10/8-101(a) of the Illinois Local Governmental and Governmental Employees Tort Immunity Act provides, in relevant part: "No civil action ... may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued."745 ILL. COMP. STAT.. 10/8-101(a). The law is settled that "Illinois local governmental entities and their employees ... benefit from a one-year statute of limitations for 'civil actions' against them....While the two-year period still applies to § 1983 claims against such defendants, ... the one-year period applies to state-law claims that are joined with a § 1983 claim."*Williams v. Lampe,* 399 F.3d 867, 870 (7th Cir.2005) (citations omitted). Here, Plaintiff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alleges that he was injured by Defendants' violations of Illinois state law on November 29, 2005. (*See, e.g.,* Pl's. Compl., at ¶¶ 9, 12-45.) Nevertheless, Plaintiff did not file the instant lawsuit until July 23, 2007, over one year after "the date that the injury was received."745 ILL. COMP. STAT.. 10/8-101(a). Moreover, Plaintiff concedes in his response to Movants' motion that Count VIII (battery), Count IX (false arrest and false imprisonment), and Count X (libel) are time-barred. The Court will therefore dismiss Counts VIII and X and Plaintiff's false arrest and false imprisonment claims in Count IX with prejudice as to Movants.

Plaintiff, however, contests Movants' motion as it relates to his state-law malicious prosecution claim in Count IX. Specifically, he argues that his cause of action for malicious prosecution did not accrue until December 21, 2006, the date that he was found not guilty on the charge of resisting a peace officer. (*See* Pl's. Compl., at ¶ 53.) That charge relates to the events that allegedly occurred on November 29, 2005 and of which Plaintiff complains. (*See id.*, at ¶¶ 43-45.)

Under Illinois law, the elements of a cause of action for malicious prosecution include "(1) the commencement or continuance of an original or criminal judicial proceeding by the defendant; (2) termination of the prosecution in favor of the plaintiff in a manner indicative of the innocence of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and[ ](5) damages resulting to the plaintiff."*Vincent v. Williams*, 279 Ill.App.3d 1, 216 Ill.Dec. 13, 664 N.E.2d 650, 652 (Ill.App.Ct.1996) (citations omitted); *see also Swick v. Liautaud*, 169 Ill.2d 504, 215 Ill.Dec. 98, 662 N.E.2d 1238, 1242 (Ill.1996) (same); *Joiner v. Benton Community Bank*, 82 Ill.2d 40, 44 Ill.Dec. 260, 411 N.E.2d 229, 232 (Ill.1980) (same). It therefore follows that "[a] cause of action for malicious prosecution does not accrue until the criminal proceeding on which it is based has been terminated in the plaintiff's favor."*Ferguson v. City of Chicago*, 213 Ill.2d 94, 289 Ill.Dec. 679, 820 N.E.2d 455, 459 (Ill.2004) (citation omitted). Accepting the allegations included in Plaintiff's complaint as true, the Court finds that Plaintiff's state-law cause of action for malicious prosecution did not accrue until December 21, 2006. Because Plaintiff's state-law malicious prosecution claim was timely filed,

Movants' motion is denied as to that cause of action. *See*745 ILL. COMP. STAT.. 10/8-101(a).

**\*3** Plaintiff also objects to Movants' motion as it relates to his claim for attorneys' fees in Count XI. In addition to arguing that Plaintiff's claim for attorneys' fees in Count XI is time-barred, Movants argue that there is no independent cause of action for attorneys' fees under Illinois law. In response, Plaintiff baldly asserts that attorneys' fees may be awarded as damages if Movants are found liable under any of his seven 42 U.S.C. § 1983 counts or his state-law malicious prosecution claim. But he does not identify any legal authority that suggests a claim for attorneys' fees may be advanced as an independent cause of action under Illinois law. *See also People Who Care v. Rockford Bd. of Educ. Dist. No. 205*, 921 F.2d 132, 134 (7th Cir.1991) ( "Attorneys' fees are not a separate claim for relief....") (citation omitted); *Aviation Constructors, Munoz, Castle v. Fed. Express Corp.*, No. 91-2835, 1991 WL 150043, at *2 (N.D.Ill. July 31, 1991) ("Count IV attempts to state an independent claim for attorney's fees....Evenassuming such remedies might be available under the circumstances of this case, ... the [plaintiffs have] asserted no basis by which [their] right to recover attorney's fees may be asserted as an independent substantive claim for relief. Accordingly, we grant judgment on the pleadings in favor of [the defendant] on Count IV."). The Court therefore dismisses Count XI without prejudice as to Movants.[FN5]

> FN5. Although Count XI is dismissed, Plaintiff is not precluded from recovering the attorneys' fees alleged in Count XI if the fees are legally recoverable as damages under any count or cause of action in Plaintiff's complaint that survives Movants' and Defendant City of Harvey's motions to dismiss.

**II. Defendant City of Harvey's Separate Motion to Dismiss Count VII**

Defendant City of Harvey argues that Plaintiff has not alleged "even minimal facts that could lead the Court to conclude the City possessed a unconstitutional policy and practice of condoning the use of excessive force by its officers."Defendant City of Harvey therefore concludes that "Count VII of Plaintiff's complaint does not state a claim under any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the ... avenues available to make a policy and procedure claim against a municipality."In response, Plaintiff writes that his complaint

sufficiently states a cause of action against [Defendant City of Harvey] for violation of his civil rights[ ] when the allegations of the [c]omplaint, as a whole, are taken into account, including the specific allegations ... involving the failure to train deputy marshals and the allegations ... involving [Defendant City of Harvey] complacently condoning the use of excessive force by its police officers and deputy marshals[ ] based on a history of excessive force by officials of [Defendant City of Harvey] and the failure of [Defendant City of Harvey] to properly discipline and/or punish its police officers and deputy marshals.

To survive Defendant City of Harvey's Rule 12(b)(6) motion, Plaintiff's complaint "must allege that an official policy or custom not only caused the constitutional violation, but was 'the moving force' behind it."*Estate of Sims v. County of Bureau,* No. 01-2884, 2007 WL 3036752, at *3 (7th Cir. Oct.19, 2007) (citations omitted). This requirement serves to " 'distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.' "*Id.* (citation and emphasis omitted). Plaintiff "may demonstrate an official policy through: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice [FN6]; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority."*Id.* (citation omitted).

> FN6. A single incident is generally insufficient "to establish a custom that can give rise to *Monell* liability."*Williams v. Heavener,* 217 F.3d 529, 532 (7th Cir.2000) (citation omitted). But "liability against a municipality may attach if persuasive evidence is presented of a ... policy or custom, or lack thereof, which reflects a showing of deliberate indifference on the part of a municipality to the constitutional rights of its inhabitants...."*Palmer v. Marion County,* 327 F.3d 588, 597 (7th Cir.2003) (citations omitted).

*4 Here, Plaintiff argues that his complaint alleges at least four "official policies" to support his *Monell* claim (Count VII):(1) the practice of hiring unqualified police officers and deputy marshals, (2) the practice of providing inadequate training to police officers and deputy marshals, (3) the practice of failing to properly discipline or punish police officers and deputy marshals for their use of excessive force, and (4) the practice of condoning the use of excessive force by police officers and deputy marshals. (*See* Pl's. Compl., at ¶¶ 4, 82-85, 88-90.) But there are at least two pleading deficiencies that warrant the dismissal of Count VII. First, Count VII does not incorporate Plaintiff's allegations that Defendant City of Harvey has engaged in the widespread practices of hiring unqualified police officers and deputy marshals and providing inadequate training to police officers and deputy marshals. (*See* Pl's. Compl., at ¶ 87.) This deficiency deprives Defendant City of Harvey of " 'fair notice of what the ... claim is and the grounds upon which it rests.' "*Concentra Health Servs., Inc.,* 496 F.3d at 776 (citations omitted). Second, Plaintiff's complaint does not allege that any of the above-listed "official policies" was the "moving force" behind a constitutional violation. *See Killingsworth,* No. 06-1616, 2007 WL 3307084, at *3;*Concentra Health Servs., Inc.,* 496 F.3d at 776;*Estate of Sims,* No. 01-2884, 2007 WL 3036752, at *3. *4 (When determining whether Plaintiff has satisfied his pleading burden, the Court looks to see if "the complaint alleges a direct causal link between a policy or custom of [Defendant City of Harvey] and the alleged constitutional violations.") (citation omitted). The Court therefore dismisses Count VII without prejudice as to Defendant City of Harvey.

**ORDERED:** Movants' motion to dismiss Counts IV, VIII, IX, X, and XI of Plaintiff's complaint [13] is granted in part and denied in part. Counts IV and XI are dismissed without prejudice as to Movants. Counts VIII and X and Plaintiff's false arrest and false imprisonment claims in Count IX are dismissed with prejudice as to Movants. Defendant City of Harvey's motion to dismiss Count VII of Plaintiff's complaint [11] is granted. Count VII is dismissed without prejudice as to Defendant City of Harvey. Plaintiff is granted leave to file an amended complaint on or before December 12, 2007. Defendants City of Harvey, Lewis, and Askar are ordered to answer Plaintiff's complaint [1] on or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4232729 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 4232729)**

before January 3, 2008. If Plaintiff files an amended complaint, Defendants City of Harvey, Lewis, and Askar are ordered to answer or otherwise move with respect to the same on or before January 3, 2008.

N.D.Ill.,2007.
Montgomery v. City of Harvey
Slip Copy, 2007 WL 4232729 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 710197 (N.D.N.Y.)
**(Cite as: Slip Copy, 2007 WL 710197)**

Pietrafesa v. First American Real Estate Information
Services, Inc.
N.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
Anthony J. PIETRAFESA, Plaintiff
v.
FIRST AMERICAN REAL ESTATE
INFORMATION SERVICES, INC., d/b/a First
American Credco, Aegis Lending Corporation, Aegis
Mortgage Corporation, "SCOTT DOE," being a
person whose real name is unknown to plaintiff now,
Jointly and Severally, Defendants.
**No. 1:05-CV-1450.**

March 6, 2007.

Anthony J. Pietrafesa, Albany, NY, pro se.
Bartlett, Pontiff, Stewart & Rhodes, P.C., Glens
Falls, NY, Eileen M. Haynes, Esq., for Defendant
Credco.

### *MEMORANDUM-DECISION AND ORDER*

LAWRENCE E. KAHN, United States District
Judge.
**\*1** Plaintiff Anthony Pietrafesa ("Plaintiff")
commenced the instant action against Defendants
alleging violations of federal Fair Credit Reporting
Act ("FCRA"), 15 U.S.C. § 1681, *et seq.,* the New
York Fair Credit Reporting Act ("NYFCRA"), N.Y.
Gen. Bus. Law § 380*et seq.,* and the New York
Consumer Protection Act, N.Y. Gen. Bus. Law §
349. Plaintiff alleges that Defendants obtained a copy
of his credit report for an improper purpose. Presently
before the Court is Defendant Credco's Motion, and
Plaintiff's Cross-Motion, for summary judgment
pursuant to FED. R. CIV. P. 56. Dkt. Nos. 8, 11.

### I. FACTS

Credco is an entity engaged in the business of
furnishing credit information from the three major
credit bureaus. Credco does not maintain credit
history information on individual consumers. Rather,
at the request of its clients, Credco compiles credit
scores from the three credit bureaus into a single,
merged report.

Prior to offering services to its clients, Credco
requires its clients to sign an agreement and
certification providing that the client will not seek
credit reports for an improper purpose and only in
connection with a "credit transaction involving the
consumer on whom the information is to be furnished
and involving the extension of credit to, or review or
collections of an account of the consumer ."In
approximately 1999, Defendant Aegis applied to
Credco to receive the merged reports. As part of the
application, Aegis supplied Credco with its business
address, identified itself as a wholesale lender, listed
the number of employees and its annual revenue,
named its officers, and supplied three references.
Credco checked the references, ensured that Aegis
was in good standing with the Office of the
Comptroller in the State of Texas (where Aegis is
located), interviewed one of Aegis's senior vice
presidents, conducted a physical inspection of Aegis's
offices to ensure that it was a bona fide lending
institution, and, as a result, determined that Aegis
was authorized to obtain credit reports and requested
such reports for a legitimate purpose.

Up through August 2005, Aegis had requested that
Credco provide "thousands of credit reports." Def.'s
Stmnt. of Mat. Facts at ¶ 12. From 1999 through
August 2005, Credco had been obtaining credit
reports for Aegis for approximately six years and
"had received no information that Aegis was
requesting reports for improper purposes."*Id.* at ¶
13.On or about August 26, 2005, Aegis requested that
Credco provide a merged report on Plaintiff. Credco
provided the report.

On or about September 9, 2005, Credco received a
notice from Aegis that it improperly requested
Plaintiff's credit report. Aegis asked that the inquiry
be removed from all credit reporting bureaus. Credco
investigated Aegis's request. Credco then wrote to
each of the three credit bureaus and requested that
they remove the inquiry from Plaintiff's credit report.
Credco also received notice from Plaintiff that he did
not authorize the release of his credit information.
Although Credco had already asked the three credit
bureaus to remove the inquiry from Plaintiff's credit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 2
Slip Copy, 2007 WL 710197 (N.D.N.Y.)
(Cite as: Slip Copy, 2007 WL 710197)

report, Credco responded to Plaintiff that he should address the matter directly with Aegis.

*2 Plaintiff then commenced the instant action alleging that Credco violated the FCRA, the NYFCRA, and the New York Consumer Protection Laws by obtaining his credit report from the three bureaus, providing that information to Aegis, and failing to provide adequate notice to Plaintiff. Presently before the Court is Credco's Motion for summary judgment pursuant to FED.R.CIV.P. 56 seeking dismissal of the Complaint in its entirety and Plaintiff's Cross-Motion seeking a determination of liability as a matter of law. Dkt. Nos. 8, 11.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In applying this standard, courts must " 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.' " Brown v. Henderson, 257 F.3d 246, 251 (2d Cir.2001) (quoting Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir.2001)). Once the moving party meets its initial burden by demonstrating that no material fact exists for trial, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted). Rather, the nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown, 257 F.3d at 251 (citation omitted). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991); Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990).

## III. DISCUSSION

### a. FCRA

Credco contends that it is entitled to summary

judgment because the undisputed facts demonstrate that, as a consumer reporting agency, it complied with the applicable provisions of the FCRA. Plaintiff responds that he is entitled to summary judgment because Credco is not a "consumer reporting agency," but a "user" of credit reports that obtained a report for an improper purpose. Thus, the initial inquiry is whether Credco is a user of credit reports or a consumer reporting agency.

The phrase "consumer reporting agency" is statutorily defined to mean any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

*3 15 U.S.C. § 1681a(f). As it is ordinarily used, the term "assemble" means "to bring together; to gather into one place." The Random House Dictionary of the English Language, 1979, at p. 89; see also Oxford English Dict. (2d Ed.1989) ("To bring together (things) into one place or mass, to collect."). The nature of Credco's business is gathering credit information
maintained by the three credit bureaus and providing that information in a single merged report to its clients. As such, its conduct constitutes "assembling." See Morrissey v. TRW Credit Data, 434 F. Supp 1107, 1108 (E.D.N.Y.1977). Credco also qualifies as a "reseller" of consumer reports. See Credit Chequers Info, Servs., Inc. v. CBA, Inc., NO. 98 CIV. 3868(RPP), 1999 WL 253600, at *2 (S.D.N.Y. Apr. 29, 1999) (an entity that provides merged credit reports identical to the reports provided by Credco here is a "reseller of credit reporting services."). The FCRA defines the terms "reseller" to mean "a consumer reporting agency that (1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party ...; and (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced." 15 U.S.C. § 1681a(u). Thus, to be a reseller, one must be: (1) a consumer reporting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                Page 3
Slip Copy, 2007 WL 710197 (N.D.N.Y.)
**(Cite as: Slip Copy, 2007 WL 710197)**

agency, *see* *Poore v. Sterling Testing Sys., Inc.,* 410 F.Supp.2d 557, 566-67 (E.D.Ky.2006), (2) that assembles and merges information maintained in the databases of other consumer reporting agencies, and (3) that does not maintain its own databases of consumer information. 15 U.S.C. § 1681e(e),

As a consumer reporting agency, Credco is obligated to comply with, among other things, the requirements of 15 U.S.C. §§ 1681b and 1681e(a)-(d). As is relevant hereto, § 1681b(a)(3) permits a consumer report to be furnished only "[t]o a person which it has reason to believe-(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer."Section 1681e requires consumer reporting agencies to "maintain reasonable procedures designed to avoid violations of section 1681c of this title and to limit the furnishing of consumer reports to the purposes listed under section 1681b of this title."15 U.S.C. § 1681e(a). These reasonable procedures must include a requirement that the prospective users of information: (1) identify themselves; (2) certify the purposes for which the information is sought; and (3) certify that the information will be used for no other purpose. *Id.* Consumer reporting agencies also are required to "make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report."*Id.* Consumer reporting agencies are prohibited from furnishing a report "to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681 b...."*Id.*Civil liability can be imposed upon someone who is negligent in failing to comply with the requirements of the FCRA. 15 U.S.C. § 1681o. "The fact that a consumer report is furnished for an impermissible purpose ... does not result in automatic liability. Liability is imposed only when the consumer reporting agency either willfully or negligently fails to maintain reasonable procedures to avoid violations of, i.e., § 1681b."*Dobson v. Holloway,* 828 F.Supp. 975, 977 (M.D.Ga.1993) (internal citations omitted).

**\*4** The undisputed evidence before the Court demonstrates that Credco complied with all of these requirements. Before accepting Aegis as a client, Credco verified Aegis's identity by requiring a completed application, verifying its status with the Office of the Comptroller of the State of Texas, checking into its line of business, conducting a physical inspection of Aegis's business, and checking Aegis's references. Credco learned that Aegis was a real estate loan company. These actions by Credco constitute reasonable efforts to verify Aegis's identity and the use for which Aegis intended to use the consumer reports. The evidence in the record further demonstrates that Credco complied with § 1681e by requiring Aegis to: identify itself, certify the purpose for which the information was sought, and certify that the information would be used for no other purpose. Plaintiff offers no evidence upon which it reasonably can be concluded that Credco had reason to believe that Aegis would obtain a consumer report for an improper purpose. To the contrary, the record evidence demonstrates that Credco had supplied Aegis with thousands of credit reports over an approximately six (6) year period without incident. Thus, Credco had no reason to believe that Aegis sought a credit report for a improper purpose.

Plaintiff has failed to identify any deviations from the standard of care to be used by credit reporting agencies in maintaining reasonable procedures to comply with §§ 1681b and 1681c. *See*15 U.S.C. § 1681o; *Dobson,* 828 F.Supp. at 977 ("To determine whether the consumer reporting agency maintained reasonable procedures, the standard of conduct is what a reasonably prudent person would do under the circumstances."); see also *Obabueki v. Int'l Bus. Machines Corp.,* 145 F.Supp.2d 371, 395-96 (S.D.N.Y.2001) (liability may be imposed upon a credit reporting agency for failing to act reasonably in complying with the FCRA). It would be unreasonable to require credit reporting agencies processing a high number of requests to independently investigate each and every request to determine its legitimacy. *See* *Boothe v. TRW Credit Data,* 557 F.Supp. 66, 71 (S.D.N.Y.1982).

Because Credco also qualifies as a reseller of consumer reports, it had additional obligations imposed upon it pursuant to § 1681e(e). Under § 1681e(e)(1), Credco was required to disclose to the "consumer reporting agency that originally furnish[ed] the report-(A) the identity of the end-user of the report (or information); and (B) each permissible purpose under section 1681b of this title for which the report is furnished to the end-user of

the report."Section 1681e(e)(2) further required Credco to:

(A) establish and comply with reasonable procedures designed to ensure that the report (or information) is resold by the person only for a purpose for which the report may be furnished under section 1681b of this title, including by requiring that each person to which the report (or information) is resold and that resells or provides the report (or information) to any other person-

*5 (I) identifies each end user of the resold report (or information);

(ii) certifies each purpose for which the report (or information) will be used; and

(iii) certifies that the report (or information) will be used for no other purpose; and

(B) before reselling the report, make reasonable efforts to verify the identifications and certifications made under subparagraph (A).

The evidence discussed above concerning Credco's compliance with § 1681b equally applies to demonstrate Credco's compliance with § 1681e(e)(2). As noted, Credco had a reasonable procedure to ensure that Aegis was using credit reports for a proper purpose and had information that Aegis was the end user of the resold report. Moreover, Aegis, as the end user, certified the purpose for which the report was used, and certified that the report would not be used for any other purpose.

There is, however, an absence of evidence in the record concerning whether Credco complied with § 1681e(1)(B). It is unknown whether Credco informed the three credit bureaus from which it obtained the credit information concerning Plaintiff of "each permissible purpose under section 1681b of this title for which the report is furnished to the end-user of the report."See15 U.S .C. § 1681e(e)(1)(B). Accordingly, the Court cannot determine on the present record whether: (1) Credco negligently failed to comply with § 1681e(e)(1)(B); and, if so, (2) Plaintiff sustained any actual damages as a result of the failure. See15 U.S.C. § 1681o(a). Credco's Motion for summary judgment on the FCRA claim

must, therefore, be denied.

**b. NYFCRA**

The Court will now turn to Plaintiff's claims under N.Y. Gen. Bus. Law Art. 25. As is relevant hereto, the requirements of Article 25 are substantially similar to those under the FCRA. See Scott v. Real Estate Fin. Group, 183 F.3d 97, 100 (2d Cir.1999). There is a difference between the two statutes, however, insofar as Article 25 does not contain additional requirements applicable to resellers as does the FCRA. For the reasons previously discussed with respect to Credco's compliance with §§ 1681 b and 1681e(a)-(d) of the FCRA, because Credco maintained "reasonable procedures to designed to avoid violations of sections three hundred eighty-b and three hundred eighty-j of this article and to limit the furnishing of consumer reports to the purposes listed under said section three hundred eighty-b," the claims under N.Y. Gen. Bus. Law §§ 380-b(a), 380-k must be dismissed.

N.Y. Gen. Bus. Law § 380-b(b) further provides that:

No person shall request a consumer report ... in connection with an application ... for credit, ... unless the applicant is first informed in writing or in the same manner in which the application is made that (l) a consumer report may be requested in connection with such application, and (ii) the applicant upon request will be informed whether or not a consumer report was requested, and if such report was requested, informed of the name and address of the consumer reporting agency that furnished the report.

*6N.Y. Gen. Bus. Law § 380-b(b). There is no evidence in the record that Credco complied with this requirement. Indeed, looking at the evidence in the light most favorable to the nonmovant, it appears that Credco did not inform Plaintiff that it intended to request a consumer report.

That being said, the Court concludes that § 380-b(b) is inapplicable here. By its plain terms, § 380-b(b) applies to requests for a consumer report "in connection with an application ... for credit."When such a request is made, notice must be given to "the applicant" that a consumer report may be requested "in connection with such application." It is arguable that Aegis's request for a consumer report was "in

connection with an application for credit."After all, this was the purported basis for Aegis's request for the credit report. Nevertheless, as Plaintiff states, he "did not initiate any business transaction, *or apply for credit ...* by or through Credco" or any other Defendant. Pl.'s Stmnt. of Mat. Facts at ¶¶ 11-12 (emphasis added); Compl. at ¶ 8. As such, strictly adhering to the text of the statute, Plaintiff cannot be an "applicant" to whom notice is required to be given. *See*N.Y. STAT. LAWW § 73 ("A statute must be read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisaged all of the problems and complications which might arise in the course of its administration; and no matter what disastrous consequences may result from following the expressed intent of the Legislature, the Judiciary cannot avoid its duty.... Under the foregoing principle ... courts may not ... change the scope of a legislative enactment"); N.Y. STAT. LAWW § 94 ("The Legislature is presumed to mean what it says.... In the construction of statutes, each word in the statute must be given its appropriate meaning.... Words will not be expanded so as to enlarge their meaning to something which the Legislature could easily have expressed but did not...."); N.Y. STAT. LAWW § 230 ("[E]ach word or phrase in the enactment must be given its appropriate meaning.).

The conclusion that § 380-b(b) does not apply to the situation where, as here, there is no actual application is supported by comparing § 380-b(b) (requiring notice for consumer reports) with §§ 380-c(a) and 380-c(b) (requiring notice for investigative consumer reports).Section 380-b(b) specifically refers to providing notice to the "applicant," whereas § 380-c(a) requires that notice be given to "the consumer." It must be assumed that when enacting Article 25, the legislature intentionally used two different terms in the two different sections. N.Y. STAT. LAWW § 98 ("[T]he court must assume that the Legislature did not deliberately place in the statute a phrase intended to serve no purpose, but must read each word and give to it a distinct and consistent meaning."); N.Y. STAT. LAWW § 97 ("Statutory words must be read in their context, and words ... of a statutory section should be interpreted with reference to the scheme of the entire section.... The different parts of the same act, though contained in difference sections, are to be construed together as if they were all in the same section.").

*7 Furthermore, § 380-c(b) expressly contemplates the type of notice to be provided in the situation where no application is made. That section provides that "[t]he notice required by this section shall be in writing *if a written application is made by the consumer,* or may be in writing or orally *in all other circumstances.*" § 380-c(b)(emphases added). By contrast, § 380-b(b) does not provide for situations where there is no application. In light of the fact that the Legislature expressly considered the situation where there is no application with respect to investigative consumer reports, the failure to include a similar provision in § 380-b(b) cannot be considered a legislative oversight, but, rather must be presumed to be an intentional omission. *See*N.Y. STAT. LAWW § 74 ("[W]hen from the language of an act and circumstances surrounding its enactment it appears that the Legislature has specified the cases to which it shall apply, the failure to specify a particular case indicates that the Legislature did not intend the act to cover such a case...."). This conclusion is even more forceful considering that, under the NYFCRA, the term "consumer" is a statutorily defined term, *see* § 380-a(b), that is purposefully and intentionally used throughout Article 25, but was not used in § 380-b(b). Because Plaintiff was not an "applicant," he was not entitled to notice under § 380-b(b).

Furthermore, the Court finds that § 380-b(b) was not intended to apply to every person or entity involved in the process of obtaining a consumer report. See *Scott v. Real Estate Fin. Group,* 956 F.Supp. 375, 385 (E.D.N.Y.1997) ( "[T]he Court finds that the language contained in the statute does not require notice from everyone involved in obtaining the consumer report."), *aff'd in part, rev'd in part,*183 F.3d 97 (2d Cir.1999). Without question, the end-user of the consumer report is subject to § 380-b(b)'s requirements. The purpose of § 380-b(b) is to require the end-user (that is, those who intend to use the credit report for making determinations concerning employment, the extension of credit, the provision of insurance, or the rental or leasing of a residence) to inform the applicant that end-user may request a consumer report as part of the decision-making process. It is the end-user who ordinarily has a direct relationship with the consumer and, therefore, is in a position to provide notice concerning the intention to obtain a consumer report. By requiring the end-user to provide this information at the time of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

application for credit, employment, insurance, or the rental or lease of an apartment, the consumer is in a position to determine whether to proceed with the application. This would appear to satisfy the policy reasons behind the notice provision-to enable consumers to know under what situations consumer reports concerning them will be obtained and to permit the consumer to discontinue the application process if they do not want their consumer report to be disclosed. Taking into consideration these purposes of § 380-b(b), the question is whether § 380-b(b) also was intended to apply to require resellers (those who obtain the consumer report from another consumer reporting agency or multiple consumer reporting agencies) to provide notice to the consumer where the end-user seeks to obtain a consumer report through that reseller.

**\*8** It is common practice for the end-users of consumer reports to obtain the reports through a middleman or reseller. As previously discussed, the FCRA expressly contemplates this situation. By the time a request for a consumer report is made to a reseller, the requirements of § 380-b(b) already should have been complied with by the end-user. Under such circumstances, it makes little sense to require the middleman, or reseller, to also provide notice to the consumer before obtaining the report that has already been requested by the end-user. Such notice would be superfluous. It also would be extremely onerous on resellers to require that they notify every consumer about whom they receive a request to obtain a consumer report.

Most significantly, perhaps, the statute prohibits requesting a consumer report "unless the applicant is first informed" that a consumer report may be requested. § 380-b(b). The required notice informs the "applicant" that "a consumer report *may* be requested in connection with such application."§ 380-b(b) (emphasis added). By the time the matter gets to a reseller, a consumer report already *has* been requested (at least by the end-user) and, thus, any notice provided by the reseller would be after the time contemplated by the statute. Notice provided by a reseller would not fulfill the above-discussed policy reasons of affording the applicant an opportunity to discontinue the application process and preventing the request and/or disclosure of his or her consumer report. For these reasons, the Court finds that § 380-b(b) is inapplicable here. The NYFCRA claims are,

therefore, dismissed.

**c. *New York Consumer Protection Law***

Plaintiff also asserts a claim under N.Y. Gen. Bus Law § 349, which makes it unlawful to engage in deceptive acts or practices in the conduct of any business or in the furnishing of any service in New York state. See N.Y. GEN. BUS LAW § 349 To recover under this section, Plaintiff must demonstrate that he suffered actual injury as a result of a practice that was objectively misleading or deceptive. *Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 n. 4 (2d Cir.2005). As the New York Court of Appeals has stated, "[a] plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered actual injury as a result of the deceptive act."*Stutman v. Chemical* Bank, 95 N.Y.2d 24, 29 (2000).

Defendant moves for summary judgment on the ground that there is no evidence that it engaged in any materially misleading or deceptive acts. In response, Plaintiff merely contends that a violation of the NYFCRA or FCRA can sustain a claim under § 349. While certain acts may constitute a violation of both the FCRA and § 349, *see, e.g., Wegmans Food Markets Inc. v. Scrimpsher (In re Scrimpsher),* 17 B.R. 999 (Bankr.N.D.N.Y.1982), here, Plaintiff has failed to identify any consumer oriented, misleading acts by Credco. Accordingly, the § 349 claim must be dismissed.

**IV. CONCLUSION**

**\*9** Accordingly, it is hereby

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 8) is **GRANTED IN PART** and **DENIED IN PART.**Defendants' Motion is **GRANTED** insofar as all of Plaintiff's claims are **DISMISSED** with the exception of the claim under § 1681 e(1)(B) of the FCRA; and it is further

**ORDERED,** that Plaintiff's Cross-Motion for summary judgment (Dkt. No. 11) is **DENIED;** and it is further

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 710197 (N.D.N.Y.)
**(Cite as: Slip Copy, 2007 WL 710197)**


**ORDERED,** that the Clerk serve a copy of this Order
on all parties by regular mail. **IT IS SO ORDERED.**

N.D.N.Y.,2007.
Pietrafesa v. First American Real Estate Information
Services, Inc.
Slip Copy, 2007 WL 710197 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2008 WL 130924 (N.D.Ill.)
(Cite as: Slip Copy, 2008 WL 130924)

Page 1

**C**Newman v. Apex Financial Group, Inc.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Jerome NEWMAN, Plaintiff,
v.
APEX FINANCIAL GROUP, INC., et al.,
Defendants.
No. 07 C 4475.

Jan. 11, 2008.

Daniel A. Edelman, Albert F. Hofeld. Jr., Cathleen
M. Combs, James O. Latturner, Edelman, Combs,
Latturner & Goodwin, LLC, Chicago, IL, for
Plaintiff.
Richard Eric Gottlieb, Todd A. Gale, Andrew
Douglas Lemar, Renee Lynn Zipprich, Dykema
Gossett PLLC, Chicago, IL, Naomi A. Carry,
Dykema Gossett LLP, Los Angeles, CA, Kathleen M.
McCabe, James Brandon Hiller, Cassiday Schade
LLP, Chicago, IL, for Defendants.

### *MEMORANDUM OPINION*

SAMUEL DER-YEGHIAYAN, District Judge.
**\*1** This matter is before the court on Defendant
Fremont Investment & Loan's ("Fremont") motion
to dismiss the claims brought against it in Counts I-IV
and on Defendant Mortgage Electronic Registration
Systems, Inc.'s ("MERS") motion to dismiss the
claim in Count IV brought against MERS. For the
reasons stated below, we deny in part and grant in
part Fremont's motion to dismiss and we deny MERS'
motion to dismiss in its entirety.

### BACKGROUND

Plaintiff Jerome Newman ("Newman") alleges that
sometime before November 2006, he contacted
Defendant Trevor York ("York"), a mortgage broker,
to obtain refinancing. York is allegedly employed by
Defendant Apex Financial Group, Inc. ("Apex").
Newman contends that Apex filled out and submitted
a loan application on behalf of Newman to Fremont,
which is allegedly in the business of originating

mortgages. Fremont allegedly originated a loan
("Loan") to Newman and his mother in the amount of
$205,000. According to Newman, some of the Loan
proceeds were withheld to pay back taxes. Four days
after the closing on the mortgage, York allegedly sent
Newman a check for loan proceeds in the amount of
$3,385.66. Newman allegedly complained to York
that Newman had not received the correct amount
and $6,908.73 was subsequently refunded to
Newman. Newman claims that despite the
explanations for the diversion of Loan funds, Apex
did not account for $42,701.06 that was directed to
York. When Newman questioned York about the
$42,701.06, York allegedly claimed that the amount
was his payment for "cleaning up" Newman's credit
and Newman's wife's credit. (A. Compl. Par 28).
Newman claims that York actually provided no
services other than acting as a mortgage broker.
Newman also claims that there are other sums from
the Loan proceeds that are not properly accounted for
in the loan statements from Apex. Newman alleges
that the sums received by Apex for brokerage
services was more than reasonable compensation for
such services. Newman also claims that Apex targets
minority borrowers and assigns higher rates to
minority borrowers than non-minority borrowers,
regardless of the borrowers' qualifications.

Newman brought the instant action and includes in
the amended complaint a claim alleging unlawful
discrimination in regard to residential real estate-
related transactions in violation of the Fair Housing
Act ("FHA"), 42 U.S.C. § 3601 et seq., brought
against Fremont and Apex (Count I), a claim alleging
unlawful discrimination in violation of the Equal
Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691
et seq., brought against Fremont and Apex (Count II),
an Illinois Consumer Fraud and Deceptive Business
Practices Act, ("Consumer Fraud Act"), 815 ILCS
505/1 et seq., claim brought against Apex, Fremont,
and York (Count III), a Truth in Lending Act
("TILA"), 15 U.S.C. § 1601 et seq., claim brought
against Fremont, Defendant Wells Fargo Bank, N.A.
("Wells") and MERS, (Count IV), a Credit Repair
Organizations Act, 15 U.S.C. § 1679 et seq., claim
brought against York and Apex (Count V), a breach
of fiduciary duty claim brought against Apex, York
and Defendant Tristar Title, LLC (Count VI), and a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 130924 (N.D.Ill.)
**(Cite as: Slip Copy, 2008 WL 130924)**

common law fraud claim brought against Apex and York (Count VII). Fremont now moves to dismiss the claims brought against it in Counts I-IV and MERS moves to dismiss the claim in Count IV brought against it.

### LEGAL STANDARD

*2 In ruling on a motion to dismiss, brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must draw all reasonable inferences that favor the plaintiff, construe the allegations of the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Thompson v. Ill. Dep't of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir.2002); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991). In order to withstand a motion to dismiss, a complaint must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High Sch.,* 144 F.3d 448, 454-55 (7th Cir.1998); *Lucien v. Preiner,* 967 F.2d 1166, 1168 (7th Cir.1992). A plaintiff is required to include allegations in the complaint that "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level' " and "if they do not, the plaintiff pleads itself out of court."*E.E. O.C. v. Concentra Health Services, Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting in part*Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). Under current notice pleading standard in federal courts a plaintiff need not "plead facts that, if true, establish each element of a 'cause of action....' "*See Sanjuan v. Amer. Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994) (stating that "[a]t this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint" and that "[m]atching facts against legal elements comes later"). The plaintiff need not allege all of the facts involved in the claim and can plead conclusions. *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002); *Kyle,* 144 F.3d at 455. However, any conclusions pled must " 'provide the defendant with at least minimal notice of the claim,' "*Kyle,* 144 F.3d at 455 (quoting *Jackson v. Marion County,* 66 F.3d 151, 153-54 (7th Cir.1995)), and the plaintiff cannot satisfy federal pleading requirements merely "by attaching bare legal conclusions to narrated facts which fail to outline the bases of [his] claims."*Perkins,* 939 F.2d at 466-67. The Seventh

Circuit has explained that "[o]ne pleads a 'claim for relief' by briefly describing the events."*Sanjuan,* 40 F.3d at 251;*Nance v. Vieregge,* 147 F.3d 589, 590 (7th Cir.1998) (stating that "[p]laintiffs need not plead facts or legal theories; it is enough to set out a claim for relief").

### DISCUSSION

Fremont and MERS (collectively referred to as "Defendants") argue that Newman has not alleged sufficient facts to state an ECOA or a FHA claim under the notice pleading standard (Counts I and II). Defendants also argue that Newman has not pled the Consumer Fraud Act with particularity (Count III). Finally, Defendants argue that Newman cannot proceed on the TILA claim since the Loan was not made for personal, family, or household use and that MERS is not a proper Defendant for the TILA claim (Count IV).

### I. Fair Housing Act Claims (Count I)

*3 Defendants argue that Newman has not pled sufficient factual details to state a FHA claim. Pursuant to 42 U.S.C. § 3605 of the FHA, "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin."42 U.S.C. § 3605(a).

Defendants argue that in pleading the FHA claim Newman "leaps to ... unsupported conclusions...." (Mem.Dis.7) (emphasis omitted). However, in pleading a claim at the motion to dismiss stage Newman is not required to support his facts with evidence. Newman unequivocally states in the amended complaint that Fremont's payment and Apex's receipt of yield spread premiums ("YSP") "disproportionately adversely effects minority borrowers such as plaintiff."(A.Compl.Par. 46). Newman further alleges that Apex, "on average, subjected plaintiff and other minority borrowers to more frequent and/or larger YSPs due to their race."(A.Compl.Par. 46). We are required to interpret the allegations in favor of Newman at this juncture. Newman has alleged that Defendants discriminate against borrowers because of their race. Newman

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 3
Slip Copy, 2008 WL 130924 (N.D.Ill.)
**(Cite as: Slip Copy, 2008 WL 130924)**

also includes other allegations such as that the resulting disproportionate impact on minorities "was known and intended by [D]efendants."(A.Compl.Par. 48). Newman alleges that Defendants "assign higher interest rates to minorities, including [Newman], than to whites, regardless of qualifications."(A.Compl. Par. 46). Newman further alleges that Defendants "intentionally and disproportionately target African-Americans and other minorities for higher cost loans, regardless of their qualifications."(A.Compl.Par. 54). Newman contends that Defendants are able to target minorities since Apex "knows who its likely customers are, including where they live, their general credit profile and their race or ethnicity" and Fremont "knows who brokers are, including the geographical communities in which they conduct marketing and broker loans as well as the racial or ethnic composition of the pool of brokers' customers."(A.Compl.Par. 53).

Defendants, deny the truth of Newman's allegations and explain how they did not engage in unlawful discrimination and how the YSPs that Apex utilizes actually "foster home ownership." (Reply 12). However, we cannot resolve such factual issues at the motion to dismiss stage. Such arguments are more appropriate at the summary judgment stage. Defendants argue that the recent ruling in *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) requires Newman to substantiate his claims. (Mem.Dis.6-7). However, in neither *Twombly* or *E.E.O. C. v. Concentra Health Services, Inc.*, 496 F.3d 773 (7th Cir.2007), in which the Seventh Circuit interpreted *Twombly, id.* at 776, did the Courts overturn the rule that the allegations that are included in the complaint must still be accepted as true and that all well pled facts are construed in favor of the plaintiff. In *Concentra,* the Court held that a plaintiff fails to state a claim if the allegations are so vague that they appear to be based on pure speculation. 496 F.3d at 776. The Seventh Circuit has not held, as Defendants propose, that a court can speculate at the pleadings stage whether a plaintiff will be able to find sufficient evidence to support his claims. The speculation referred to in *Concentra* exists when there is an absence of specific facts in the complaint that could "plausibly suggest that the plaintiff has a right to relief...."*Id.*

*\*4* In the instant action, Newman provides sufficient

facts that suggest the possibility that Defendants discriminated against minorities. Newman contends that he is a minority borrower that was charged an unreasonably higher rate that was not based on his qualifications. Newman also contends that Defendants assigned higher rates to minority borrowers than to non-minority borrowers, regardless of the borrowers' qualifications. Such facts, if accepted as true, may indicate unlawful discrimination.

All of Defendants' arguments that the amended complaint contains "unfounded discrimination claims," (Mem.Dis.11), go to the merits of the claims, which is not a proper inquiry at the motion to dismiss stage. Whether or not Defendants charged minority borrowers higher rates, or whether Defendants can come forth with legitimate business reasons to justify the rates at issue, or whether Defendants' rates actually encourage home ownership are not matters that can be addressed at the motion to dismiss stage. At the motion to dismiss stage a court must assess whether a plaintiff has stated a valid claim, rather than assess the merits of the plaintiff's allegations.

Defendants also incorrectly assert that *Twombly* holds that a plaintiff must plead the elements of a claim. (Mem.Dis.10). As indicated above, under the federal notice pleading standard, a plaintiff is required to provide adequate notice to a defendant of the claims being brought. *Sanjuan*, 40 F.3d at 251. Nowhere in *Twombly* or in *Concentra,* interpreting *Twombly,* did either Court state that a plaintiff in federal court must plead facts to match up with each element of a claim in order to state a claim, and in fact the Seventh Circuit in *Concentra* made it clear that a plaintiff need not plead an exhaustive list of facts to state a valid claim, stating that "[m]ost details are more efficiently learned through the flexible discovery process."*Concentra Health Servs., Inc., 496 F.3d at 779.*

Defendants also argue that, in light of *Twombly,* the court should dismiss the FHA claim since Newman will "bear[ ] an immense burden of proof" and Defendants' business operations will be disrupted by discovery in this action. (Mem.Dis.12). However, nowhere in *Twombly* or in *Concentra,* did either Court alter controlling precedent and Federal Rules of Civil Procedure which instruct courts to inquire as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 130924 (N.D.Ill.)
(Cite as: Slip Copy, 2008 WL 130924)

to whether a plaintiff has stated a valid claim at the motion to dismiss stage and subsequently at the summary judgment stage assess whether, in light of the evidence, a party can prevail at law. The Court in *Concentra* made it clear that, although the pleading standard is more restrictive, the overall civil procedure remains the same, stating that detailed factual pleading is not required and "a plaintiff might sometimes have a right to relief without knowing every factual detail supporting its right; requiring the plaintiff to plead those unknown details before discovery would improperly deny the plaintiff the opportunity to prove its claim." *Id.* at 780.Therefore, we deny the motion to dismiss the FHA claims (Count I).

## II. Equal Credit Opportunity Act Claims (Count II)

**\*5** Defendants argue that Newman has not pled sufficient factual details to state an ECOA claim. Pursuant to 15 U.S.C. § 1691 of ECOA, "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)...."15 U.S.C. § 1691(a). As indicated above in regard to the FHA claim, Newman has provided sufficient facts in the complaint to adequately provide Defendants with notice of the allegations of discrimination. Defendants' arguments that Newman's claims are without merit are more appropriate at the summary judgment stage. Thus, Defendants' arguments are premature and we deny the motion to dismiss the ECOA claims (Count II).

## III. Consumer Fraud Act Claim (Count III)

Defendants argue that Newman has not pled the Consumer Fraud Act claim with specificity. Pursuant to Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), a plaintiff is required to plead fraud-based claims with particularity. Fed.R.Civ.P. 9(b). The particularity requirement "applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations."*Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 507 (7th Cir.2007)*. Newman contends that he has not pled a deceptive conduct-based claim and instead intended to plead unfair conduct-based claims. *See Robinson v. Toyota Motor*

*Credit Corp., 201 Ill.2d 403, 266 Ill.Dec. 879, 775 N.E.2d 951, 960-61 (Ill.2002)* (indicating that a plaintiff can recover under the Consumer Fraud Act for "unfair as well as deceptive conduct"). Newman contends that his unfair conduct-based claims are not based on fraudulent conduct.

Although Newman now indicates that he is not bringing a fraud-based claim, the allegations in the amended complaint clearly indicate otherwise. Newman alleges that Apex, Fremont, and Trevor "engaged in deceptive and unfair practices" in violation of the Consumer Fraud Act. (A.Compl.Par. 84). Newman also alleges as part of the allegations that are specifically tied to his Consumer Fraud Act claims that Apex, Fremont and Trevor violated the act by "[k]nowingly and fraudulently imposing, disguising and pocketing plaintiff's loan proceeds in the amount of $42,701.06," and by "[m]isrepresenting the finance charge, amount financed and annual percentage rate by failing to include the additional $42,701.06 in broker compensation and points and fees."(A.Compl.Par. 84(b) (d)). Newman further alleges that Apex, Fremont, and Trevor concealed facts about the Loan from Newman and engaged in such conduct to "induce" Newman to enter into the Loan. (A.Compl.Par. 86, 88). Such allegations clearly allege deceptive and fraudulent practices rather than practices that may simply prove to be unfair. Thus, regardless of whether Newman attempts to depict his Consumer Fraud Act claim as a deceptive acts claims or unfair acts claim, they are premised upon allegations of concealment, misrepresentation, and fraud and Rule 9(b) applies to such claims. *See Borsellino, 477 F.3d at 507* (stating that "[a] claim that 'sounds in fraud'-in other words, one that is premised upon a course of fraudulent conduct-can implicate Rule 9(b)'s heightened pleading requirements").

**\*6** In order to plead a fraud-based claim with particularity, a plaintiff "must provide 'the who, what, when, where, and how.' *Borsellino, 477 F.3d at 507* (quoting in part *United States v. AIDS Research Alliance-Chicago, 415 F.3d 601, 605 (7th Cir.2005))*. Although the allegations concerning Defendants' improprieties in regard to the Loan are sufficient in general to state valid claims for the other counts in the amended complaint, the allegations do not include the specificity required under Rule 9(b)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 130924 (N.D.Ill.)
(Cite as: Slip Copy, 2008 WL 130924)

for a fraud-based claim. Newman has not provided specific facts concerning how the fraud was perpetrated. Nor has he provided exact details when the alleged fraud occurred. Therefore, we grant the motion to dismiss the Consumer Fraud Act claim brought against Fremont (Count III).

*IV. Truth in Lending Act Claims (Count IV)*

Defendants argue that TILA does not apply to the Loan since the Loan was obtained for commercial use. Defendants also argue that MERS is not a proper Defendant for the TILA claim.

*A. Commercial Aspects of Loan*

Defendants argue that Newman cannot proceed on the TILA claim since the Loan was not made for personal, family, or household use. TILA provides that certain transactions are exempted from the TILA protections, including "[c]redit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, or to government or governmental agencies or instrumentalities, or to organizations." 15 U.S.C. § 1603(1). Defendants contend that the Loan at issue involved commercial matters and is not covered by TILA. However, Newman does not allege in the amended complaint that the Loan involved commercial matters. That is a fact outside the scope of the allegations in the amended complaint, which are pertinent to assess whether Newman has stated a valid claim. We also note that Newman, in response to the motion to dismiss, actually asserts that the Loan was for personal and family use. (Ans.F.16-17). It is not proper to address such factual disputes at the motion to dismiss stage. We can only determine at this juncture whether, when accepting Newman's allegations as true, Newman has stated a valid TILA claim. We find that Newman has stated a valid TILA claim and therefore, we deny the motion to dismiss the TILA claim brought against Fremont (Count IV).

*B. Propriety of MERS as a Defendant*

Defendants also argue that MERS is not a proper Defendant for the TILA claim. Newman alleges in the amended complaint that MERS "holds title to the mortgage that resulted from the" Loan transaction. (A.Compl.Par. 10). Newman also states that MERS "is a party necessary to be joined if

feasible."(A.Compl.Par. 10). Pursuant to Federal Rule of Civil Procedure 19(a), "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (I) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."Fed.R.Civ.P. 19(a).

*7 MERS argues that a TILA claim can only be brought against a creditor of the plaintiff or an assignee of the creditor. MERS contends that the complaint merely alleges that MERS holds title to the mortgage and is neither a creditor or an assignee of a creditor of Newman. However, MERS does not dispute Newman's contention that MERS, as the holder of the title of the mortgage, has the ability to exercise certain rights such as the right to initiate foreclosure actions under the terms of the Loan and mortgage. The exercise of such a right would necessarily interfere with the instant proceedings and any ruling on the issue presented in these proceedings would in turn impact MERS' rights. In addition, Newman can acquire complete relief only with the inclusion of MERS. Foreclosure proceedings would interfere with a potential recision of the mortgage agreement that could be awarded as relief to Newman if he prevailed on the TILA claim. MERS has not challenged Newman's position concerning the interest and rights that MERS has in regard to the mortgage at issue in this case or explained why MERS should not necessarily be joined in this action. Thus, based upon the record at this juncture we find that MERS is properly joined as a Defendant. Therefore, we deny the motion to dismiss the claim brought in Count IV against MERS.

## CONCLUSION

Based on the foregoing analysis, we deny Fremont's motion to dismiss the claims brought against Fremont in Counts I, II, and IV, and we grant the motion to dismiss the claim brought against Fremont in Count III. We also deny MERS' motion to dismiss in its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 6

Slip Copy, 2008 WL 130924 (N.D.Ill.)

**(Cite as: Slip Copy, 2008 WL 130924)**

entirety.

N.D.Ill.,2008.

Newman v. Apex Financial Group, Inc.

Slip Copy, 2008 WL 130924 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2008 WL 567031 (N.D.Ill.)
(Cite as: Slip Copy, 2008 WL 567031)

Page 1

**H**CardioNet, Inc. v. LifeWatch Corp.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
CARDIONET, INC., Plaintiff,
v.
LIFEWATCH CORP., Hanna Konarzewska, M.D.,
Joel Lehman and Lisa Ament, Defendants.
Lifewatch Corp., Counter-plaintiff,
v.
Cardionet, Inc., Counter-defendant.
**Civil Action No. 07 C 6625.**

Feb. 27, 2008.

Thomas L. Duston, Alisa Colleen Simmons, Gregory
James Chinlund, Julianne Marie Hartzell, Marshall,
Gerstein & Borun, Chicago, IL, Amy L.
Kashiwabara, Julie L. Fieber, Richard Keenan,
Folger Levin & Kahn LLP, San Francisco, CA, for
Plaintiff/Counter-defendant.
Sean W. Gallagher, Bartlit Beck Herman Palenchar
& Scott LLP, Chicago, IL, Alexander Kaplan, Julie
A. McCane, Kevin J. Perra, Proskauer Rose LLP,
New York, NY, Michael P. Kelleher, Folger Levin &
Kahn LLP, San Francisco, CA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

SUZANNE B. CONLON, District Judge.
*1 Counter-plaintiff Life Watch Corp. ("Life
Watch") sues counter-defendant CardioNet, Inc.
("CardioNet") for trade secret misappropriation under
the Illinois Trade Secrets Act, 765 ILCS 1065/1 et
seq. (Count I), violation of the Lanham Act, 15
U.S.C. § 1125(a) (Count II), violation of the Illinois
Uniform Deceptive Trade Practices Act
("IUDTPA"), 815 ILCS 510/2 (Count III), violation
of the Illinois Consumer Fraud and Deceptive Trade
Practices Act ("ICFA"), 815 ILCS 505/2 (Count IV),
interference with expectation of business
relationships (Count V), and unfair competition
(Count VI). CardioNet moves to dismiss Counts II,
III, IV, V, and VI. For the reasons stated below,
CardioNet's motion is granted in part.

**I. MOTION TO DISMISS STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges a
counterclaim on the basis of a failure to state a claim
on which relief can be granted. In ruling on the
motion, the court accepts as true all well-pleaded
facts and draws all reasonable inferences from those
facts in Life Watch's favor. *Jackson v. E.J. Brack
Corp., 176 F.3d 971, 977 (7th Cir.1999).* The
counterclaim must allege "enough facts to state a
claim to relief that is plausible on its face."*Bell
Atlantic Corp. v. Twombly, --- U.S. ----, ----, 127
S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).*
LifeWatch need only provide enough detail to give
CardioNet fair notice of its claims, show that the
claims are plausible, rather than merely speculative,
and that relief is warranted. *EEOC v. Concentra
Health Care Servs., Inc., 496 F.3d 773, 776 (7th
Cir.2007)* (quoting *Twombly, 127 S.Ct. at 1964*
(further citations omitted)).

**II. BACKGROUND**

CardioNet and LifeWatch are competitors that make
heart monitoring devices. In January 2007,
LifeWatch launched a heart monitoring device called
the LifeStar Ambulatory Cardiac Telemetry (the
"LifeStar ACT") in the United States. The LifeStar
ACT is comprised of wireless sensors worn by
patients and a cellular phone that monitors a patient's
heart rhythm. If irregular heart events occur, the
LifeStar ACT transmits data to a LifeWatch service
center for analysis and response.

The LifeStar ACT is not sold to users; rather, it is
only prescribed to patients. LifeWatch and affiliated
companies have expended significant time and
resources in developing and protecting the
confidential, proprietary, and trade secret software
that malces up the LifeStar ACT system.

In June 2007, a physician improperly arranged to
have a LifeStar ACT system delivered to CardioNet's
CEO in San Diego, California. Without Life Watch's
knowledge, CardioNet's CEO, its head of research,
and its head of product development, examined and
tampered with the LifeStar ACT device. They took

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 2
Slip Copy, 2008 WL 567031 (N.D.Ill.)
**(Cite as: Slip Copy, 2008 WL 567031)**

detailed photographs of it, copied written materials, removed the circuit board and shielding material from the sensor, and performed electrical tests,

CardioNet then allowed the device to be delivered to the patient for whom it was prescribed. The device was eventually returned to LifeWatch for circulation to other patients. CardioNet did not inform LifeWatch that it tampered with the device, and denied ever doing so. CardioNet used the information obtained from inspection of the LifeStar ACT to develop the next generation of its competing device.

**\*2** CardioNet also used information it learned from the device to further its marketing strategy. CardioNet misrepresented in advertisements and statements to physicians and governmental and private third party insurers that (1) its device was the only FDA approved and Medicare reimbursed arrhythmia detection and alarm system; (2) the LifeStar ACT device did not and could not meet the FDA's requirements for approval of an arrhythmia detection and alarm system; and (3) its device was superior and/or safer than the LifeStar ACT device. LifeWatch contends these statements were false and misleading because the LifeStar ACT had and has FDA approval, and the statements wrongfully suggest that the LifeStar ACT is less safe or reliable than CardioNet's device.

CardioNet moves to dismiss LifeWatch's counterclaims premised on false and misleading advertisements (Counts II-VI). CardioNet advances the following: (1) LifeWatch failed to plead required elements of its Lanham Act and intentional interference claims; (2) LifeWatch's statutory claims are a species of fraud and do not satisfy Rule 9(b)'s particularity requirements; (3) allegations that CardioNet's device is "superior," more "reliable" or "safer" than LifeWatch's are non-actionable puffery; and (4) allegations regarding FDA requirements for the parties' medical devices fail because they are not subject to consumer fraud statutes.[FN1]

> FN1. CardioNet improperly refers to materials beyond the pleadings, which are not considered on a Rule 12(b)(6) motion. *See Loeb Indus., Inc. v. Sumitomo Corp., 306 F.3d 469, 479 (7th Cir.2002).* CardioNet also requests judicial notice of two documents indicating that the FDA

approved the LifeStar ACT device as an arrhythmia detector and alarm on December 18, 2007. Because judicial notice is unnecessary in resolving CardioNet's motion, the questionable request is moot.

### III. DISCUSSION

#### A. Rule 9(b)

CardioNet argues LifeWatch's Lanham Act, IUDTPA, and ICFA counterclaims (Counts II-IV) are insufficient to state a claim. However, the sufficiency of the allegations cannot be properly assessed because the claims fail to meet the heightened pleading requirements of Fed.R.Civ.P. 9(b). Fed.R.Civ.P. 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

Claims that allege false representation or false advertising under the Lanham Act are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b).*Conditioned Ocular Enhancement, Inc. v. Bonaventura,* 458 F.Supp.2d 704, 709 (N.D.Ill.2006) (Zagel, J.) (citations omitted). IUDTPA and ICFA claims sounding in fraud must also meet the pleading requirements of Rule 9(b).*Id.* (ICFA claim); *Am. Top English, Inc. v. Lexicon Mktg. (USA), Inc.,* No. 03 C 7021, 2004 WL 1403695, at *4-5 (N.D.Ill. June 21, 2004) (Conlon, J.) (ICFA claim); *Gold v. Golden G. T., LLC,* No. 05 C 288, 2005 WL 2465815, at *6 (N.D.Ill. Oct.4, 2005) (Filip, J.) (ICFA and IUDTPA claims); *Nakajima All Co., Ltd. v. SL Ventures Corp.,* No. 00 C 6594, 2001 WL 641415, *6-7 (N.D.Ill. June 4, 2001) (Gettleman, J.) (ICFA and IUDTPA claims).[FN2]

> FN2. Under Illinois law, ICFA claims must also be pleaded with the same specificity as common law fraud claims. *Smith v. Prime Cable of Chicago,* 276 Ill.App.3d 843, 857, 658 N.E.2d 1325, 1335, 213 Ill.Dec. 304.314 (Ill.App.Ct.1995) (citations omitted).

LifeWatch's argument that Rule 9(b) does not apply to its IUDTPA and ICFA claims because they do not sound in fraud is belied by its allegations. LifeWatch alleges that after CardioNet inspected the LifeStar ACT device, CardioNet knowingly and deliberately

made misrepresentations in its marketing strategy. Countercl. ¶ 28. LifeWatch contends that CardioNet falsely misled physicians and third party insurers into believing that: (1) its device was the only FDA approved and Medicare reimbursed arrhythmia detection and alarm system; (2) the LifeStar ACT device did not and could not meet the FDA's requirements for approval of an arrhythmia detection and alarm system; and (3) its device was superior and/or safer than the LifeStar ACT device. Because these allegations sound in fraud, Rule 9(b)'s specificity requirements apply to LifeWatch's IUDTPA and ICFA counterclaims. *See, e.g., Nakajima,* 2001 WL 641415, at *6-7 (Rule 9(b) applies to allegations of false or misleading advertisements/statements that sound in fraud).

*3 Under Rule 9(b), LifeWatch's Lanham Act, IUDTPA, and ICFA counterclaims must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated."*Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992) (quoting *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990)). In other words, LifeWatch must plead the "who, what, when, and where of the alleged fraud."*Uni*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992). The absence of essential details renders these counterclaims deficient.

LifeWatch does not identify *who* made false and misleading statements, *when* they were made, *where* they were made, or the medium in which they were made. The particulars of the false and misleading statements are also absent. For example, LifeWatch's bare-bones allegation that CardioNet "advertised and made other statements ... to the effect that its device is superior to and/or safer that then LifeStar ACT device" merely alleges that unspecified advertisements *had the effect* of implying that CardioNet's device was superior and safer. Countercl. ¶ 31. These nebulous allegations fall short of Rule 9(b)'s requirements. *See, e.g., Nakajima,* 2001 WL 641415, at *6-7. CardioNet and the court are left to speculate what specific advertisements and statements underlie LifeWatch's claims. Accordingly, counterclaims II-IV are dismissed.

**B. State Common Law Claims**

### 1. Intentional Interference With Expectation of Business Relationships

CardioNet argues LifeWatch's intentional interference with expectation of business relationships counterclaim should be dismissed because LifeWatch did not identify any specific relationships subjected to interference. To state a claim for tortious interference with a prospective economic advantage, LifeWatch must allege: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional and malicious interference inducing or causing a breach or termination of the relationship or expectancy; (4) resultant damage to the party whose relationship has been disrupted. *Small v. Sussman,* 306 Ill.App.3d 639, 648, 239 Ill.Dec. 366, 713 N.E.2d 1216 (Ill.App.Ct.1999). The acts that form the basis of tortious interference must be directed at parties other than CardioNet. *Cont'l Mobile Tel. Co.., Inc. v. Chicago SMSA Ltd. P'ship,* 225 Ill.App.3d 317, 325, 167 Ill.Dec. 554, 587 N.E.2d 1169 (Ill.App.Ct.1992). Although LifeWatch contends that CardioNet must *specifically* identify a third party with which it had a potential business relationship, LifeWatch may alternatively allege a prospective class of third parties against whom the conduct was directed. *See Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 529, 137 Ill.Dec. 409, 546 N.E.2d 33 (Ill.App.Ct.1989).

*4 Construing allegations in its favor, LifeWatch alleges CardioNet's false and misleading advertisements were directed toward physicians, private insurers, and Medicare reimbursement providers-the targeted consumers of their LifeStar ACT product. This constitutes a prospective class of third parties adequate to give CardioNet notice of its claim. *See, e.g., Russian Media Group, LLC v. Cable Am., Inc.,* No. 06 C 3578, 2008 WL 360692, *5 (N.D.Ill. Feb.7, 2008) (Darrah, J.) (allegations that defendants' conduct was directed against third party consumers was sufficient to withstand dismissal).

LifeWatch also adequately pleads independent wrongful conduct to withstand dismissal of its intentional interference counterclaim. LifeWatch alleges CardioNet intentionally interfered with its prospective relationships by knowingly issuing false and misleading statements to limited consumers of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the LifeStar ACT device. This allegation of wrongdoing is sufficient to give CardioNet notice of its intentional interference claim. *See, e.g., Conditioned Ocular Enhancement,* 458 F.Supp.2d at 712 (intentional interference claim adequately pleaded under Rule 8(a)).

### *2. Unfair Competition*

Illinois courts have not specifically enumerated the elements of the common law tort of unfair competition. *See Gorgonz Group, Inc. v. Mormon Holdings, Inc.,* No. 00 G 2992, 2001 WL 103406, *3-4 (N.D.Ill. Jan.30, 2001)* (Kennelly, J.) (citing *Custom Bus. Sys., Inc. v. Boise Cascade Corp.,* 68 Ill.App.3d 50, 52, 24 Ill.Dec. 801, 385 N.E.2d 942, 944 (Ill.App.Ct.1979)). However, the allegations underlying a claim of tortious interference with prospective economic advantage also suffice to state a claim for unfair competition.*Id.; see also Zenith Elec. Corp. v. Exzec, Inc.,* No. 93 C 5041, 1997 WL 223067, at *5 (N.D.Ill. Mar.27, 1997)* (Manning, J.). Because LifeWatch adequately alleges intentional interference, LifeWatch's unfair competition claim is sufficient as well.

### IV. CONCLUSION

For the foregoing reasons, CardioNet's motion to dismiss is granted in part. Counts II, III, and IV of LifeWatch's counterclaims are dismissed.

N.D.Ill.,2008.
CardioNet, Inc. v. LifeWatch Corp.
Slip Copy, 2008 WL 567031 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                        Page 1
Not Reported in F.Supp.2d, 2005 WL 3077606 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3077606)**

**H**In re Sears Roebuck & Co. Tools Marketing and
Sales Practices Litigation
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
In re SEARS ROEBUCK & CO. TOOLS
MARKETING AND SALES PRACTICES
LITIGATION
**No. MDL-1703, 05 C 4742, 05 C 2623.**

Nov. 14, 2005.

*MEMORANDUM OPINION*

GRADY, J.
*1 Before the court is defendant's motion to dismiss
for failure to state a claim in Anderson v. Sears,
Roebuck & Co., No. 05-2623.For the reasons stated
below, the motion is granted.

*BACKGROUND*

Plaintiffs Larry Steven Anderson, Jr., Tammy Cyr,
Charles Chatham, Heather Pistorius and Charles
Velez have brought this consolidated class action
complaint against defendant Sears Roebuck &
Company alleging violations of the Illinois Consumer
Fraud and Deceptive Business Practices Act, 815
ILCS § 505/2, *et seq.* ("ICFA") (Count I) and the
Illinois Deceptive Trade Practices Act, 815 ILCS §
510/1, *et seq.* ("DTPA") (Count II), as well as claims
for unjust enrichment (Count III) and "equitable
relief" (Count IV). All counts stem from plaintiffs'
allegation that Sears deceptively advertised its
proprietary line of "Craftsman" tools as
manufactured exclusively in the United States
("Made in USA") when, in fact, many of the tools are
foreign-made or contain significant foreign parts.

Sears has moved to dismiss the complaint for failure
to state a claim under Rule 12(b)(6). Within days of
the motion being fully briefed, Sears was granted
leave to supplement its motion papers with an
argument that plaintiffs lack standing to bring claims
under the ICFA and the DTPA, relying on the Illinois
Supreme Court's recent decision in *Avery v. State*

*Farm Mut. Auto Ins. Co.,* 216 Ill.2d 100, 296 Ill.Dec.
448, 835 N.E.2d 801 (2005). Plaintiffs have
responded.

*DISCUSSION*

*Counts I and II*

The ICFA provides that "deceptive acts or practices
... or the concealment, suppression or omission of any
material fact, with intent that others rely upon the
concealment, suppression or omission of such
material fact ... in the conduct of any trade or
commerce are hereby declared unlawful...."815 ILCS
§ 505/2. The Act authorizes a private right of action:
"[a]ny person who suffers actual damage as a result
of a violation of this Act committed by any other
person may bring an action against such person."815
ILCS § 505/10a(a). To prevail on a claim under the
ICFA, a private plaintiff must establish: (1) a
deceptive act or practice by the defendant, (2) the
defendant's intent that the plaintiff rely on the
deception, (3) the occurrence of the deception in the
course of conduct involving trade or commerce, and
(4) actual damage to the plaintiff (5) proximately
caused by the deception.*Oliveira v. Amoco Oil Co.,*
201 Ill.2d 134, 776 N.E.2d 151, 267 Ill.Dec. 14
(2002). The Act defines "trade or commerce" as
follows:

The terms 'trade' and 'commerce' mean the
advertising, offering for sale, sale, or distribution of
any services and any property, tangible or intangible,
real, personal or mixed, and any other article,
commodity, or thing of value wherever situated, and
shall include any trade or commerce directly or
indirectly affecting the people of this State.

815 ILCS § 505/1(f). At issue in *Avery,* and our focus
here, is what is meant by "trade or commerce directly
or indirectly affecting the people of this State."*Id.*
The *Avery* court began with an extensive survey of
the caselaw: some cases have held that only Illinois
residents have standing to assert an ICFA claim;
other cases hold that non-Illinois residents can
maintain a claim if the transaction giving rise to the
action occurred in Illinois; and at least one case stated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077606 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3077606)

that a non-resident may state a claim for a transaction outside Illinois so long as the action implicates Illinois's "interest in protecting its consumers." *Avery,* 296 Ill.Dec. 448, 835 N.E.2d at 816-19 (collecting cases). The court settled on something of a middle path: an ICFA plaintiff does not necessarily have to be an Illinois resident, but the Act does not apply to "fraudulent transactions which take place outside Illinois."*Id.* 296 Ill.Dec. 448, 835 N.E.2d at 853. The court held, then, that "a plaintiff may pursue a private cause of action under the [ICFA] if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois."*Id.* 296 Ill.Dec. 448, 835 N.E.2d at 853-54.

**\*2** Although *Avery* did not establish a bright-line test for determining when a transaction occurs "primarily and substantially" in Illinois, it pointed to the following factors to guide the analysis: (i) plaintiff's residence, (ii) where the deception occurred, *i.e.,* where the actual misrepresentation was made, (iii) where the damage to plaintiff occurred, and (iv) whether plaintiff communicated with defendant or its agents in Illinois. *Id.* 296 Ill.Dec. 448, 835 N.E.2d at 823-24. Significantly, the court rejected the notion that an allegation that a defendant was headquartered in Illinois or that its deceptive practices flowed from Illinois were sufficient to assert a claim:

The appellate court's conclusion that a scheme to defraud was "disseminated" from State Farm's headquarters is insufficient. *See, e.g., Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 340 & n. 10 (N.D.Ill.1997) (where the only connection with Illinois is the headquarters of the defendant or the fact that a scheme "emanated" from Illinois, the Consumer Fraud Act "does not apply to the claims of the non-Illinois plaintiffs....")

*Id.* 296 Ill.Dec. 448, 835 N.E.2d at 855.

Now, to the complaint before us. Under *Avery,* plaintiffs may bring a claim under the Act only if "the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois."*Id.* 296 Ill.Dec. 448, 835 N.E.2d at 854. Not one plaintiff is an Illinois resident-Anderson is a citizen of North Carolina; Cyr is a citizen of Wisconsin; Chatham is a citizen of Alabama; Pistorius is a citizen of Pennsylvania; and Velez is a citizen of New York. There are no allegations that

any plaintiff read any misrepresentation in Illinois, purchased any tools in Illinois, or had any contact with a Sears agent in Illinois. The only allegation in the complaint from which the court can infer a nexus with Illinois is the location of Sears's principal place of business. (*Compl.,* ¶ 9.) *Avery* is clear, however, that this will not suffice to assert a claim under the Act. The same analysis applies under the DTPA claim. *SeeKeller Med. Specialties Prods. v. Armstrong Med. Indus., Inc.,* 842 F.Supp. 1086, 1093 (N.D.Ill.1994). Accordingly, because plaintiffs have not alleged facts which, if true, would grant them standing to pursue a claim under the ICFA or the DTPA, defendant's motion to dismiss Counts I and II will be granted.

*Counts III and IV*

Counts III and IV, taken together, assert claims for unjust enrichment, an injunction, and a declaratory judgment. Each of these "claims" (remedies, really) depends on the viability of an underlying claim of injury, and without standing to assert a cause of action under the Illinois statutes, these counts fail as well.

*CONCLUSION*

Although we grant defendant's motion to dismiss, we will defer entering the appropriate dismissal order until we discuss with counsel the impact of this ruling on the transferred cases in this Multidistrict Litigation at a status hearing which we have set for November 30, 2005 at 11:30 a.m.

N.D.Ill.,2005.
In re Sears Roebuck & Co. Tools Marketing and Sales Practices Litigation
Not Reported in F.Supp.2d, 2005 WL 3077606 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.